UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VICTOR MARTINEZ,

                                    Petitioner,

       -against-

UNITED STATES OF AMERICA,

                                    Respondent.
------------------------------------------------------------X

                               10 Cv. 7561 (RPP)
                               06 Cr. 591(RPP)

                          **ORDER & OPINION**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       On September 11, 2010, Petitioner Victor Martinez ("Martinez" or "Petitioner"), <u>pro se</u>,

submitted a petition of habeas corpus seeking to vacate, set aside or correct his sentence pursuant

to 28 U.S.C. § 2255.  Martinez also submitted a motion for discovery pursuant to Federal Rule of

Criminal Procedure ("Fed. R. Crim. P.") 6, seeking a transcript of the grand jury proceedings in

his case.  For the following reasons, Martinez's motions are denied.

**I. PROCEDURAL HISTORY**

       On July 17, 2006, Martinez was indicted on one count of conspiracy to distribute heroin

in violation of 21 U.S.C. §§ 812, 846, 841(a)(1), and 841(b)(1)(A).  On October 11, 2006,

attorney Samuel Braverman ("Braverman") entered an appearance on behalf of Martinez.  (ECF

No. 75.)[1]  On October 23, 2006, Martinez submitted a motion to suppress physical evidence

obtained from a search of his apartment, and for production of <u>Brady</u> material in the

Government's possession.  (ECF No. 89.)  On December 18, 2006, the Court orally denied

Martinez's motion to suppress the evidence, concluding that the search was conducted after

Martinez signed the consent form.  (Tr. of Dec. 18, 2006 Evidentiary Hr'g at 105-06.)  On

---

[1] Citations to "ECF No." refer to entries in the SDNY Electronic Case Filing System for docket number 06 Cr. 591
(RPP) unless otherwise indicated.

1

August 22, 2007, the Government filed a superseding indictment (the "Indictment") in the case, again charging Martinez with one count of conspiracy to distribute heroin, and specifically alleging that Martinez supplied heroin to co-conspirators in the area surrounding Longwood Avenue and Fox Street in the Bronx, and that he concealed $7,500 in a refrigerator located in an apartment on Beck Street in the Bronx.  (ECF No. 196.)

Martinez's trial began on September 4, 2007.  On September 11, 2007, the jury returned a guilty verdict against Martinez on the single count in the Indictment.  Following the verdict, Martinez moved to set aside the jury verdict pursuant to Fed. R. Crim. P. 29, or in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33, arguing that the verdict was an unreasonable conclusion in light of the evidence presented, specifically "the credibility of the witnesses, their inconsistencies exposed upon cross-examination, and the failure by the Government to introduce physical evidence which tended to corroborate the claims of the cooperating witnesses."  (ECF No. 210 at 1.)  On September 28, 2007, the Court denied the motion, concluding that there was adequate evidence for the jury to convict Martinez.  (ECF No. 217.)  On March 4, 2008, Martinez was sentenced to 262 months of imprisonment, to be followed by a five-year term of supervised release, and a mandatory $100 special assessment.  (ECF No. 264.)  In calculating Martinez's sentence, the Court determined that a four-point leadership enhancement applied pursuant to § 3B1.1(a) of the Sentencing Guidelines, because Martinez was the leader or organizer of criminal activity involving five or more participants.  (Tr. of Mar. 4, 2008 Sentencing Hr'g at 28.)  The Court also determined that the conspiracy involved between three and ten kilograms of heroin.  (See id. at 13, 32.)

On March 11, 2008, Martinez appealed the Court's final judgment, arguing that he was deprived of a fair trial based on comments made by the Court during his attorney's summation,

and that he was improperly sentenced.  On March 3, 2009, the Second Circuit affirmed this

Court's decision in a summary order.  See United States v. Tito, 313 Fed. App'x 402 (2d Cir.

Mar. 3, 2009).  On June 2, 2009, Martinez's motion for a re-hearing en banc was denied.  On

November 2, 2009, the Supreme Court denied his petition for a writ of certiorari.  See Martinez

v. United States, 130 S. Ct. 528 (2009).  Braverman represented Martinez during all stages of the

case, from pre-trial proceedings through direct appeal.

On September 11, 2010, Martinez, pro se, submitted a petition for habeas corpus relief

pursuant to 28 U.S.C. § 2255.  Therein, Martinez alleges that: (1) the evidence seized from his

apartment was unlawfully obtained and should have been suppressed; (2) his indictment was

fraudulent because it was not based on sufficient evidence to show probable cause; (3) his

conviction was based on insufficient evidence; (4) the four-point leadership sentencing

enhancement was erroneously applied; and (5) his defense counsel was ineffective for failing to

raise these and certain other issues, resulting in a violation of his rights under the Fifth and Sixth

Amendments.  Martinez requests that the Court grant his petition, permit an evidentiary hearing

on the claims, and vacate his sentence and conviction.  (Pet'r's Mot. to Vacate ("Pet'r Mot.") at

12.)  Martinez also submitted a motion for discovery pursuant to Fed. R. Crim. P. 6, seeking "a

copy of the grand jury testimony of any and all government witnesses who went before the grand

jury which indicted him; that provided testimony about him" in order to prove defects in the

Indictment.  (Pet'r's Mot. for Disc. Pursuant to Fed. R. Crim. P. 6 ("Pet'r Disc. Mot.") at 2.)  On

June 21, 2011, the Government filed an opposition to Martinez's motions, requesting that the

Court deny Martinez's petition of habeas corpus and motion for additional discovery.  (Gov't's

Mem. in Resp. to Pet'r's Mot. for Habeas Corpus Relief ("Gov't's Mem.").)  On August 22,

2011, Martinez submitted a reply to the Government's brief. (Pet'r's Mem. Responding to Resp't's Mem. ("Pet'r Reply").)

## II. FACTS[2]

At trial, the Government presented the testimony of four of Martinez's co-conspirators, as well as two law enforcement agents who participated in the investigation.  The co-conspirators testified about the operations of the heroin distribution network and their personal interactions with Martinez.  Specifically, they testified that from in or about 2001 to July 2006, Martinez, a/k/a "Butchie" or "Butch," was the leader of a narcotics distribution network.  The network distributed heroin in the vicinity of Longwood Avenue and 156th Street, between Fox and Kelly Streets, in the Bronx, New York (the "Longwood vicinity").  Martinez controlled and supplied heroin to the individuals that worked in this network, determined where and when the workers could sell and what percentage of the sale each individual could take, and received a portion of the proceeds from all heroin sales.

### A.    The Testimony of Henry Tilo

The first co-conspirator to testify was Henry Tilo a/k/a "Dog" ("Tilo").  Tilo testified that he grew up with Martinez in the Longwood area of the South Bronx.  (47.)  In 2000, Martinez approached Tilo and asked him if he wanted to sell heroin.  (58.)  Tilo agreed, and began selling on Longwood Avenue, in between Fox and Beck Street.  (61.)  Initially, Tilo would receive the heroin from Martinez's friends "Sunday" and "Little Mike."  (58.)  He would receive between 10 and 30 "bundles"[3] of heroin at a time.  (60.)  Each glassine bag of heroin would be marked with a stamp to indicate its brand.  (61.)  The heroin that Tilo received was marked with the "Suzuki"

---

[2] The following is a summary of the evidence presented at trial.  Citations in this section are to the Trial Transcript, Sept. 4-11, 2007.

[3] A "bundle" of heroin consists of ten glassine bags filled with heroin.  (60.)  Each bag sells for $10, and a bundle costs $100.  (61.)

brand. (61.) After selling the heroin, Tilo would keep 15% of the proceeds for himself, and give the rest of the money to "Sunday" and "Little Mike." (64.) After six months or a year, Tilo began receiving heroin directly from Martinez. (66.) He would receive between 50 and 60 bundles at a time, which would take him about two days to sell. (66.) He would keep 15% of the proceeds, and give the remaining 85% to Martinez. (72.) This continued until April of 2001, when Tilo was involved in a shooting. (72.) Tilo went to jail as a result of the shooting, and was incarcerated for several months. (73.)

When he returned to the neighborhood, Tilo found out that other people working for Martinez were now making 25% off of each bundle that they sold. (88.) Tilo approached Martinez and asked him about this, and Martinez told Tilo that he too would get 25% when he started working again. (89.) Tilo began selling again under this new arrangement, obtaining heroin from Martinez approximately every two days. (89.) At that time, the heroin Tilo would receive bore stamps that read "Suzuki" and "24/7." (89.) Martinez told Tilo where he could and could not sell heroin in the neighborhood. (95.) One location that was off limits was the area in front of Martinez's brother's pizza shop on Longwood Avenue, just east of Fox Street. (95.)

As sales began to increase, Martinez told Tilo that he would not be giving him heroin directly anymore, and instead, Tilo would receive it from Christian Balseca a/k/a "Spell" ("Balseca"). (97.) At this point Tilo was selling approximately 100 bundles of heroin every two days. (98.) Thereafter, Tilo received heroin from Balseca for six months to a year, and then began receiving heroin directly from Martinez again. (99.) Tilo had a number of people working for him on the street who would actually make the hand-to-hand heroin sales, including Frankie Gonzalez a/k/a "Frankie" ("Gonzalez"), Javier Coralieng a/k/a "Tego" ("Coralieng"), and Elizabeth Cintron a/k/a "Liz" ("Cintron"). (98-99, 185-187.) These individuals were known

5

as "pitchers."[4]  Alvin Sanchez a/k/a "Papo Swing" ("Sanchez"), also worked for Tilo, but was allowed to receive heroin directly from Martinez as well.  (102.)  Hector Matos a/k/a "Cuso" a/k/a "Green Eyes" ("Matos"), received heroin from Tilo and Sanchez and passed it down to the pitchers, but would also pitch himself.  (103.)  Gonzalez, Coralieng, and Cintron worked directly for Sanchez and Tilo, but everyone ultimately worked for Martinez.  (104.)  Salvador Otero a/k/a Fat Papo ("Otero"), also received heroin directly from Martinez to sell.  (94.)

Generally, Tilo would receive the heroin directly from Martinez.  Tilo would then pass this heroin on to Sanchez, who would distribute it to the pitchers on the street to sell.  (108.)  After the heroin was sold, each of the pitchers would take a certain percentage.  Tilo would then take a percentage for himself, and give the remainder of the money back to Martinez, who he referred to as "the boss."  (113.)  Tilo continued to sell heroin for Martinez until approximately February 2005.  (116.)

**B.    The Testimony of Detective Clarence Fredericks**

Detective Clarence Fredericks ("Fredericks") of the New York Police Department (the "NYPD") testified next at trial.  Fredericks testified that he had worked for the NYPD for 16 years, and had been a detective since 1999.  (178.)   He testified that he was assigned to the Bronx narcotics major case unit, and that in July 2004 he began an investigation of Martinez for heroin distribution.  (178-79.)  The investigation focused on the area of the South Bronx in the vicinity of Longwood Avenue, specifically Longwood Avenue between Beck Street and Fox Street, as well as Beck Street between 156th Street and Longwood Avenue, and Fox Street between 156th Street and Longwood Avenue.  (181.)  The investigation lasted for almost two years, until May 2006, during which time undercover officers made over 60 different purchases

---

[4] Tilo testified that "[a] pitcher is the one that goes and does the hand-to-hand combat in the corner.  He's the one that has a bundle of heroin and distributed it to the heroin addict . . . ."  (103.)

resulting in a total of approximately 300 bundles of heroin.  (180-81.)  A portion of the heroin purchased by the undercovers bore the "Suzuki" stamp.  (184.)

Fredericks personally conducted surveillance, video surveillance, undercover buys, and background checks of individuals who had been arrested in Martinez's neighborhood.  (179.) Video surveillance was taken by Fredericks from inside his vehicle, using a handheld camera. (189.)  Approximately ten such videos were taken, all of which were admitted into evidence at trial.  (190.)  One video shows Coralieng, Tilo, Sanchez, and others together in the vicinity of Longwood Avenue on September 13, 2004.  (207-09.)  In another, taken on September 29, 2004, Coralieng is seen making a hand-to-hand heroin sale.  (206.)  Another video taken that day shows a group of people waiting in a "cheese line"[5] to purchase drugs.  (217.)  Fredericks also testified that when the police arrested Martinez on July 18, 2006, they found $7,500 in cash inside a refrigerator in the room Martinez was found in.  (246.)

## C.    The Testimony of Christian Balseca

Balseca was the second co-conspirator to testify at trial.  He testified that he started selling heroin for Martinez on Fox Street in late 2002, and continued selling until July 2003. (268.)  Balseca was working as a livery cab driver, and initially, Martinez would call him for rides.  (278.)  Eventually, Balseca had a conversation with Martinez about selling heroin, and the two came to an agreement whereby Balseca would receive heroin from Martinez, and distribute it to a number of pitchers who would make the hand-to-hand sales.  Balseca would allow the pitchers to keep 15% of the proceeds from the sales, keep 10% for himself, and give the remaining 75% back to Martinez.  (280-81.)  Martinez subsequently gave Balseca 30 bundles of heroin bearing the stamp "24/7," which Balseca handed off to a pitcher named "Psycho."  (282-

---

[5] Fredericks testified that a "'cheese line' refers to a group of people waiting for the purpose to, in one area, to purchase narcotics."  (217.)

83, 285.)  Once all of the heroin had been sold, Balseca took his percentage, paid "Psycho," and gave the rest of the money to Martinez.  (283-84.)  After this transaction, Martinez continued to supply Balseca with heroin, giving him between 50 and 70 bundles at a time.  (285.)  Balseca would pass the heroin off to a pitcher named "Crazy" and another pitcher named "Fat Bastard" to sell on the street.  (286.)  Balseca was introduced to these people by Tilo, who was also working for Martinez at the time.  (288-89.)  Tilo would also receive heroin from Martinez, and used pitchers, including Matos, to sell for him.  (291.)   Balseca and his pitchers would have the morning shift, which lasted from 6:00 a.m. until 5:00 p.m.  (291-92.)  Tilo and his pitchers would then arrive, and sell during the night shift, from 5:00 p.m. on.  (292.)  At the height of his business, Balseca was selling 80 to 100 bundles of heroin a day, all of which was supplied by Martinez.  (294.)

        In January 2003, Balseca asked Martinez if he could take on more responsibilities in order to make more money.  (297.)  Martinez agreed to give Balseca more work, and Balseca began taking on some of the responsibilities that Martinez had held previously.  (297.) Specifically, Balseca would receive a large amount of heroin from Martinez, and distribute this heroin to Tilo, and four or five other individuals who lived in different neighborhoods.  (298-99.) Balseca would also be responsible for collecting the money from these individuals and returning it to Martinez.  (298, 304.)  In return for these increased responsibilities, Balseca received an increase in the percentage he would retain.  (300.)  He now was entitled to 15% of all sales made by his pitchers in the Longwood vicinity, with 15% going to the pitchers and the remaining 70% to Martinez.  (301.)  In addition, Balseca began to get more and more heroin from Martinez; generally between 600 and 1500 bundles at a time.  (301.)  In one instance, Martinez provided Balseca with 2,650 bundles of heroin.  (301.)  Balseca would pick the heroin up from Martinez in

a number of places; often times it was at Martinez's home. (302.) He would meet Martinez once or twice a week to drop off money. (304.) Balseca himself was making between $1,500 and $2,000 a day at this time. (305.) He considered himself the "number two" in the organization, behind Martinez who was the "number one." (320.) Balseca stopped selling heroin for Martinez on July 28, 2003. (325.)

**D.     The Testimony of Elizabeth Cintron**

Cintron worked as a pitcher and a "tester" in Martinez's organization between 2004 and 2005. (403.) Cintron was a heroin addict who used to purchase "Suzuki" and "Bar Code"[6] heroin in the Longwood vicinity two to three times a week in 2003. (394-96.) She would purchase the heroin from Sanchez, Matos, Gonzalez, Tilo, and Otero. (397.) In December 2004 she approached Sanchez and asked him if she could sell heroin. (397.) Sanchez eventually supplied her with a bundle of heroin, and told her that when she finished selling the bundle, she was to keep $10 for herself, and give the remaining $90 to him. (398.) Cintron followed his directions, and soon was selling every day in the vicinity of Longwood Avenue and Fox Street. (399.) Cintron began receiving heroin from Matos, Gonzalez, Tilo, and Otero in addition to Sanchez. (401.) She would receive both "Suzuki" and "Bar Code" brands. (401-02.) Cintron worked in the evening, and would sell about seven or eight bundles of heroin a day. (400.)

On one occasion in December 2004, Cintron asked Sanchez for heroin to sell, and Sanchez told her that he didn't have any. (405.) Sanchez then said "let me call Butch," and called someone on the phone. (405-06.) During the ensuing conversation, Cintron heard Sanchez say "let me go and get the candy." (406.) After hanging up the phone, Sanchez left, got in a cab, and returned 45 minutes later with heroin. (407.) On another occasion in the middle of

---

[6] The transcript incorrectly refers to "Bar Code" as "Barco." When Cintron was asked how to spell that particular brand name, she spelled it "B-A-R-C-O-D-E." (426.)

December 2004, Cintron received a ride home from Tilo at around 11:00 p.m.  (409.)  After

picking Cintron up on the corner of Longwood Avenue and Fox Street, Tilo proceeded to the

corner of 156th Street and Beck Street, and parked the van he was driving on 156th between

Beck and Kelly.  (410.)  Soon thereafter, a black car pulled up behind Tilo's van and parked.

(411-12.)  Tilo got out of his van, and walked behind it to meet Martinez, who had emerged from

the black car.  (412.)  Cintron watched as Martinez handed Tilo a brown paper bag.  (413.)  Tilo

then returned to the van, took two bundles of "Suzuki" brand heroin out of the brown paper bag,

and handed them to Cintron.  (414.)  In January of 2005, due to an increase in police presence in

the Longwood vicinity, Cintron stopped selling heroin on Longwood Avenue and Fox Street, and

began selling out of her house at 1227 Bronx River Avenue.  (403.)  Sanchez also lived at 1227

Bronx River Avenue, and continued to supply Cintron with heroin to sell.  (405.)

**E.**      **The Testimony of Hector Matos**

Matos started selling heroin in 2003 after he was introduced to Tilo and Sanchez by a

mutual friend.  (479-80.)  When Matos first met Tilo and Sanchez, they were selling "Suzuki"

brand heroin on the corner of Longwood Avenue and Fox Streets.  (481-82.)  After establishing a

friendship with Tilo and Sanchez, Matos began working for them as a pitcher, selling heroin

early in the morning.  (482-83, 488.)  Initially, Matos sold between five and ten bundles of

heroin a day.  (484.)  Matos would keep $10 from every bundle he sold, and give the rest of the

proceeds to Tilo or Sanchez, who would pass the money on to Martinez, who had supplied the

heroin.  (484-85.)  Matos continued to sell heroin, and by 2004 he was selling between 20 and 40

bundles a day.  (491.)  Matos was working directly for Tilo at this point, and Tilo "promoted"

him, bringing in pitchers, including Cintron, to work under Matos so that Matos wouldn't have to

make hand-to-hand sales anymore.  (491.)  For every bundle sold by one of his pitchers, Matos

would pay the pitcher $10, keep $5 for himself, and give the remaining $85 to Tilo.  (492.)

On one occasion in 2004, Tilo called Matos and told him that neither Tilo nor Sanchez

was available, and that Matos was to go and pick up a quantity of heroin from Martinez at the

corner of Longwood and Beck.  (493.)  When Matos arrived at that intersection, he saw Martinez

in a gold BMW.  (493.)  When he approached the car, Martinez said "look, it's there, in that

baggy, the cheese doodle baggy."  (493.)  Matos noticed a cheese doodle bag on the floor board

of the BMW, and picked it up.  (494.)  Inside of the bag was 30 bundles of "Suzuki" brand

heroin.  (494.)  On two or three other occasions, Matos would accompany Sanchez when he

picked up heroin from Martinez.  (495.)  Matos would walk with Sanchez to Martinez's house,

and wait outside while Sanchez entered.  (495.)  When Sanchez exited the house, he would come

out with "Suzuki" brand heroin.  (495.)  On one occasion, Matos was at Sanchez's house

smoking marijuana when Sanchez told him he was expecting a delivery of heroin.  (496.)  Later

that day, Martinez stopped by Sanchez's house in the gold BMW.  (496.)  Sanchez went

downstairs, and when he returned, he had heroin with him.  (497.)  Matos stopped selling heroin

in January of 2005 after Sanchez's house was raided by the police.  (502.)

**F.     The Testimony of Fitzroy Robinson**

Detective Fitzroy Robinson of the Drug Enforcement Agency ("DEA") testified about the

arrest of Martinez.  On July 18, 2006, Martinez was arrested at 774 Beck Street, Bronx, New

York.  (549.)  When the officers arrived at that location, they knocked on the door and a male

answered.  (550.)  The officers explained that they were looking for Victor Martinez, and the

male indicated that Martinez was in the back room of the apartment.  (550.)  When the officers

reached the back room, which was a small bedroom, they found Martinez with a female

11

companion.  (550.)  Martinez gave written consent to a search of the apartment, and the officers

proceeded to search the bedroom and the living room.  (552.)  The officers recovered $7,500 in

cash from a small refrigerator in the bedroom, and a Ziploc bag containing several rubber bands

from the night table.  (552-57.)

### III. LEGAL STANDARD

Martinez is proceeding pro se, and thus his submissions will be "liberally construed in his

favor," Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995) (citing Haines v. Kerner, 404 U.S.

519, 520 (1972)), and read to "raise the strongest arguments that they suggest," Graham v.

Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citation omitted).  28 U.S.C. § 2255 provides, in

pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the sentence was in excess of
> the maximum authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside, or correct the
> sentence.

28 U.S.C. § 2255.

"[P]risoners seeking habeas relief must not only prove that constitutional violations

occurred at trial, but also that such errors caused substantial prejudice or a fundamental

miscarriage of justice."  Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995).  A collateral

challenge brought under § 2255 is subject to the "procedural default rule," which "prevents

claims that could have been brought on direct appeal from being raised on collateral review

absent cause and prejudice."  Yick Man Mui v. United States, 614 F.3d 50, 54 (2d Cir. 2010); see

also Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) ("In order to raise a claim that could

have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the

claim at the appropriate time and prejudice from the alleged error.")  An ineffective assistance of counsel claim is not subject to the procedural default rule, and "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."  Massaro v. United States, 538 U.S. 500, 504 (2003).

## IV. DISCUSSION

Martinez raises four grounds for vacating his sentence:  First, he claims that his Fourth Amendment rights were violated.  Second, he claims that the Indictment was defective for insufficient evidence, and constitutes fraud upon the Court.  Third, he claims that the jury verdict and sentencing enhancement were not based on sufficient evidence.[7]  Fourth, he claims ineffective assistance of counsel for failure to raise these, and certain other claims, and to practice due diligence.  Martinez also seeks discovery of the grand jury testimony in order to support his claim that the Indictment was defective.

### A.        Claim of a Fourth Amendment Violation

Petitioner argues that "[t]he seizure of his person and the arrest and search were illegal in violation of the fourth amendment," and thus the evidence seized as a result of the July 18, 2006 apartment search was "fruit of a poisonous [t]ree" and must be suppressed.  (Pet'r Mem. at 5.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the [Supreme] Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution."  Chambers v. Maroney, 399 U.S. 42, 51 (1970).  Evidence seized without probable cause – the quantum of evidence "which would warrant a man of reasonable caution in

---

[7] These claims will be considered and discussed separately.

the belief that a felony has been committed" – may be excluded and may not constitute as proof against the defendant.  Wong Sun v. United States, 371 U.S. 471, 479, 484 (1963) (internal citations omitted).

Application of the exclusionary rule in the face of a Fourth Amendment violation is not compulsory, but instead depends on the "efficacy of the rule in deterring Fourth Amendment violations in the future as well as a determination that the benefits of deterrence outweigh the costs."  United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010) (quoting Herring v. United States, 555 U.S. 135, 140-41 (2009).  For example, the exclusionary rule does not apply to situations in which evidence was obtained based on an objectively reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.  See United States v. Leon, 468 U.S. 897, 909 (1984) (permitting the introduction of evidence obtained as a result of a reasonable, good-faith search, regardless of the defective search warrant).  Such an inquiry into the good-faith of the officers conducting the search is "'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'"  Herring, 555 U.S. at 145 (quoting Leon, 468 U.S. at 922 n.23). Consequently, an officer's objectively reasonable reliance on a subsequently invalidated search warrant is not grounds for suppressing the resulting evidence.  Leon, 468 U.S. at 922.  Here, the officers who arrested Petitioner acted in good faith, pursuant to the arrest warrant that was issued after the grand jury returned its indictment.  Thus, even if there was a defect in the Grand Jury proceedings, which there was not, (see infra, Section IV.B), the exclusionary rule would not apply to the evidence seized in this case.

Furthermore, voluntary consent of a person authorized to grant such consent is a well-established exception to the warrant requirement.  "[S]o long as the police do not coerce consent,

a search conducted on the basis of consent is not an unreasonable search." United States v. Hernandez, 85 F.3d 1023, 1028-1029 (2d Cir. 1996) (internal citations omitted). Here, the arrest warrant did not serve as the legal basis for the search of the apartment where Petitioner was arrested. Instead, the officers searched the apartment only after receiving oral and written consent from Petitioner. At the December 18, 2006 suppression hearing, the Court denied Martinez's original suppression motion and determined that his consent was validly given. (Tr. of Dec. 18, 2006 Suppression Hr'g at 105-06.) Petitioner does not now assert any new factual allegations which suggest that he did not indeed validly consent. Therefore, his claim under the Fourth Amendment fails as a matter of law.

**B.     Claim that the Indictment is Defective**

Martinez argues that the evidence presented to the Grand Jury failed to establish probable cause that he "committed a [d]rug offense '[p]rior' to his arrest." (Pet'r Mem. at 5.) A motion alleging a defect in the indictment or information "must be raised before trial . . . but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). A defendant waives the right to challenge the indictment if he fails to raise it prior to trial. United States v. Harley, 682 F.2d 1018, 1021 (D.C. Cir. 1959). In Harley, the defendant argued that the indictment was defective because the government failed to introduce any evidence before the grand jury that the substance he allegedly sold was in fact heroin and therefore the evidence was insufficient to support the grand jury's probable cause finding that he distributed or possessed heroin. Id. The court found that the defendant waived this right by waiting until his post-conviction appeal to challenge the indictment. Id. An exception to this rule may be made on a showing of good cause. Fed. R. Crim. P. 12(e). Good cause exists when there is an abuse of

15

discretion or a clear legal error by the court, or a reasonable excuse for the defendant's failure to

bring the claim at an earlier time.  United States v. Kopp, 562 F.3d 141, 143 (2d Cir. 2009);

United States v. Klump, 536 F.3d 113, 120 (2d Cir. 2008).  Ineffective assistance of counsel

could form a basis for "good cause" within the meaning of Fed. R. Crim. P. 12(e).  However,

because Martinez's claim is meritless, ineffective assistance of counsel does not provide a valid

basis for relief.

Generally, even in the absence of a waiver, an indictment valid on its face cannot be

challenged on the ground that the grand jury acted on the basis of inadequate evidence.  United

States v. Calandra, 414 U.S. 338, 345 (1974); Costello v. United States, 350 U.S. 359, 409

(1956); see United States v. Casamiento, 887 F.2d 1141, 1182 (2d Cir. 1989) (finding the

indictment valid on its face and dismissing challenge to the indictment where the defendant

alleged that the government merely summarized the evidence against him for the grand jury).

"The grand jury's sources of information are widely drawn, and the validity of an indictment is

not affected by the character of the evidence considered."  Calandra, 414 U.S. at 344-345.  Even

where all the evidence before the grand jury is "in the nature of 'hearsay,'" the Fifth Amendment

requires nothing more than an indictment, valid on its face,[8] returned by a legally constituted and

unbiased grand jury.  Costello, 350 U.S. at 363.  The Court in Costello went on to note that

establishing a rule permitting defendants to challenge indictments on the ground that they are not

supported by adequate or competent evidence would "run counter to the whole history of the

grand jury institution, in which laymen conduct their inquiries unfettered by technical rules."  Id.

at 364.

---

[8] An indictment is valid on its face when it meets the basic pleading requirements set forth by Fed. R. Crim. P. 7, which requires only "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1); United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009).  Here, the Indictment clearly alleges Martinez's participation in a conspiracy to distribute heroin.

Further, a review of the evidence presented to the grand jury in this case demonstrates that the Government presented sufficient evidence to support the Indictment.   Fredericks testified to the grand jury that a confidential informant told him that Martinez controlled and led the sale of heroin in the alleged area.  (Tr. of July 17, 2006 Grand Jury Proceedings at 4-5.)  In response to this tip, Fredericks conducted a large-scale investigation to gather more information, spanning over two-years and including 70 to 75 undercover drug buys.  (Id. at 5.)  In the course of his investigation Fredericks made a number of arrests, and three cooperating witnesses provided information about their relationship and interactions with Martinez, implicating him in the crime charged.  (Id. at 11-15.)  While Fredericks never witnessed Martinez selling drugs, multiple times during the course of his surveillance he observed Martinez in the vicinity of where the drugs were being sold, and the cooperating witnesses informed him that Martinez was "the boss."  (Id. at 14-15.)  This evidence alone was sufficient for the grand jury to establish probable cause for the Indictment.

In his motion, Petitioner cites to portions of Fredericks's trial testimony in which Fredericks acknowledges that during his video surveillance he never observed Martinez selling or buying narcotics, or generated any direct evidence of Martinez's involvement in the selling or buying of heroin.  (Pet'r Mot. at 4.)  However, a lack of direct evidence is not a bar to a grand jury's finding of probable cause.  Moreover, any potential defect in the grand jury proceedings would be deemed harmless in light of the jury's unanimous verdict – beyond a reasonable doubt – that Martinez was guilty of the charge in the Indictment.  See United States v. Mechanik, 475 U.S. 66, 70 (1986) ("Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."); United States v. Morrison, 153 F.3d 34, 55 (2d Cir. 2002) (finding the jury's guilty verdict

against the defendant rendered harmless any error resulting from the grand jury's use of perjured

testimony and altered tape recordings to indict him).

## C.     Insufficient Evidence for Conviction Claim

Martinez next claims that the jury had insufficient evidence to convict him.  (Pet'r Mot.

at 6.)  In support of this argument he cites Fredericks's trial testimony; specifically, testimony

regarding the lack of direct evidence of Petitioner's involvement in the selling or buying of

heroin uncovered during Fredericks's investigation, and the absence of drug trafficking

paraphernalia or pre-recorded money recovered from the apartment where Petitioner was

arrested.  (Id. at 6-7; Transcript of Sept. 4-11, 2007 Trial ("Tr.") at 219-20, 248.)

A defendant raising a claim for sufficiency of the evidence supporting a conviction bears

a heavy burden.  United States v. Gaskin, 364 F.3d 438, 459 (2d Cir. 2004).  First, "the

factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon

judicial review all of the evidence is to be considered in the light most favorable to the

prosecution."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  All reasonable inferences must

also be drawn in the Government's favor.  Gaskin, 364 F.3d at 459.  In this way the factfinder's

responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts in left intact.  Jackson, 443 U.S. at 319.  The conviction must be

affirmed if, "any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  United States v. Henry, 325 F.3d 93, 103 (2d Cir. 2003); Jackson,

443 U.S. at 319.

When reviewing the evidence, "pieces of evidence must be viewed not in isolation but in

conjunction, and the jury's verdict may be based on circumstantial evidence."  United States v.

D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994) (internal quotations and citations omitted).  Here,

the Government introduced ample evidence for the jury to establish proof beyond a reasonable doubt of Petitioner's guilt.  (See supra, Section II.)  Four co-conspirators testified regarding their first-hand knowledge of Petitioner's role as the boss of the narcotics operation.  Two of these witnesses were managers in Petitioner's heroin business and received drugs directly from Petitioner.  Accordingly, there was ample evidence from which a rational jury could have found the essential elements of the crime beyond a reasonable doubt.

**D.     Insufficient Evidence for Sentence Enhancement Claim**

Petitioner claims that the Court did not have sufficient evidence to apply a four-point leadership enhancement to his sentence, pursuant to § 3B1.1(a) of the Sentencing Guidelines. (Pet'r Mot. at 8.)  Petitioner bases his claim of insufficient evidence on the lack of direct evidence and reliance solely on witness testimony.  (Id.)  Petitioner also asserts that this claim is not procedurally barred because he was represented by the same counsel at trial and on direct appeal, representation he now claims was ineffective.  (Pet'r Reply at 3.)

A "collateral attack on a final judgment in a criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'"  Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995).  "[C]laims that the Court erred in applying [sentencing] enhancement levels are neither constitutional, nor jurisdictional, nor do they raise any 'fundamental defect[s] which inherently result[ ] in a complete miscarriage of justice, nor an[y] omission[s] inconsistent with the rudimentary demands of fair procedure.'"  Ortega v. United States, 897 F. Supp. 771, 782 (S.D.N.Y. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  "[A]bsent a complete miscarriage of justice, such claims will not be

19

considered on a § 2255 motion where the defendant failed to raise them on direct appeal."

Graziano, 83 F.3d at 590.

An exception exists, however, for sentencing guidelines challenges which take the form

of a Sixth Amendment ineffective assistance of counsel claim.  Johnson v. United States, 313

F.3d 815, 817 (2d Cir. 2002) (vacating defendant's sentence for ineffective assistance of counsel

where trial counsel's failure to object to a sentencing calculation error likely resulted in an

increase in defendant's period of incarceration); see Massaro v. United States, 538 U.S 500, 504

(2003) (holding that an ineffective assistance of counsel claim may be brought in a collateral

proceeding under § 2255, whether or not the petitioner could have raised the claim on direct

appeal).  Martinez alleges that Braverman failure to object to the imposition of the leadership

enhancement at sentencing, and failure to preserve this issue for direct appeal, constitutes

ineffective assistance of counsel.  (Pet'r Mot. at 11.)  However, as Petitioner's insufficient

evidence claim is meritless, his ineffective assistance claim fails.  There was ample evidence and

testimony presented at trial to demonstrate that Martinez was the leader of the conspiracy.

Among other things (see supra, Section II), Martinez was specifically referred to as the "boss,"

(Tr. at 113), and "number one" in the organization, (id. at 320); he told other workers where they

could and could not sell heroin (id. at 95); and he distributed a large volume of heroin to his

workers, providing Balseca with 2,650 bundles on one occasion alone (id. at 301).

## E.    Claim of Fraud

Martinez requests that the court vacate the jury verdict pursuant to Federal Rule of Civil

Procedure 60(b) ("Rule 60(b)"), due to fraud committed on the court through false charges in the

Indictment.  A Rule 60(b) motion claiming fraud upon the court is not available when it attacks

the integrity of the underlying criminal conviction.  See Rodriguez v. Mitchell, 252 F.3d 191,

199 (2d Cir. 2001) (explaining that the grounds asserted in support of the Rule 60(b) motion must have occurred in the course of the federal habeas proceedings, not in the litigation of the conviction against which the petition is directed).  Additionally, a Rule 60(b) motion "is limited to fraud which seriously affects the integrity of the normal process of adjudication, and embraces 'only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'"  United States v. Bennett, S1 97 CR 639 (SAS), 2004 U.S. Dist. LEXIS 5722, at *8 (S.D.N.Y. Apr. 1, 2004) (quoting Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1325 (2d Cir. 1995)).  Examples of conduct that satisfies the definition of fraud upon the court include "bribery of a judge, jury tampering, or hiring an attorney for the sole purpose of improperly influencing the judge."  Id. (citing United States v. Buck, 281 F.3d 1336, 1342 (10th Cir. 2002) and In re Genesys Data Techs., Inc., 204 F.3d 124, 130 (4th Cir. 2000)).  Martinez's allegations that the Government knowingly charged Petitioner with a false indictment and obtained a grand jury indictment without "any evidence that Martinez was involved in any criminal activity," (Pet'r Mot. at 8-9), does not constitute fraud upon the court under Rule 60(b).

## F.      Ineffective Assistance of Counsel Claim

To establish a claim for ineffective assistance of counsel, a petitioner must show that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Counsel's performance was deficient if it "fell below an objective standard of reasonableness" under "prevailing professional norms."  Id. at 688.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id. at 690.

When evaluating counsel's conduct, the court bears in mind that there are "countless ways to provide effective assistance in any given case," and as a result, counsel is presumed to have acted within a wide range of reasonable professional assistance.  United States v. Aguirre, 912 F.2d 555, 560 (2d. Cir. 1990) (internal citation omitted).  A petitioner must also show that the deficiency in counsel's performance had an effect on the result; that is, that the error was prejudicial to the petitioner.  Id. at 691-96.  Prejudice to the petitioner is demonstrated by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 687, 694.  A reasonable probability exists when confidence in the outcome is undermined.  Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994).  A showing that counsel's errors had "some conceivable effect" on the result is insufficient.  Strickland, 466 U.S. at 693.

Martinez claims that his counsel was ineffective for failing to challenge certain issues throughout the course of the case, namely that: (1) prior to trial, Braverman failed to challenge the sufficiency of the Indictment and to raise the Fourth Amendment issue of probable cause; (2) Braverman failed to obtain the grand jury transcripts that reflected fraud committed by the government and NYPD; (3) Braverman failed to object to the four-point enhancement at sentencing; and (4) Braverman failed to appeal the Court's denial of his motion for a new trial. (Pet'r Mot. at 10-11.)

Counsel's "failure to make a meritless argument does not rise to the level of ineffective assistance" and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995).  As discussed supra, Petitioner's claims that the Indictment was not based on a

finding of probable cause, that the evidence did not support the jury's verdict, and that the sentencing enhancement was improperly applied to him, are meritless.  (See supra, Sections IV.B, IV.C & IV.D.)  His alleged failure to obtain the grand jury transcripts is also meritless, as discussed infra.  (See infra, Section IV.G.)  In his pre-trial motion to suppress the evidence, Braverman raised the Fourth Amendment issue, and argued it in front of the Court on December 18, 2006.  The motion was denied.  Finally, after the Government concluded its case, Braverman filed a motion under Fed. R. Crim. P. 29 for a new trial and renewed his motion for acquittal.  In his post-trial motion for setting aside the jury verdict pursuant to Fed. R. Crim. P. 29, Braverman argued that there was insufficient evidence upon which the jury based its verdict.  Braverman's decision not to appeal the Court's denial of his Fed. R. Crim. P. 29 motion was not unreasonably deficient, as the claims underlying the motions were meritless and would have been rejected as a matter of law.  See McGrath v. United States, 60 F.3d 1005, 1006, 1010 (2d Cir. 1995) (denying petitioner's habeas corpus petition alleging ineffective assistance of counsel because the counsel was not derelict in failing to raise the claim on direct appeal).

Even if Braverman were required to raise the issues that Martinez submits, there is not a reasonable probability that the final decision would have been different.  Martinez has failed to meet either prong of the Strickland test, and thus his claims for ineffective assistance of counsel are denied.

**G.      Motion for Discovery of Grand Jury Testimony**

Martinez seeks discovery of the grand jury testimony of all the witnesses who testified before the grand jury.  (Pet'r Disc. Mot. at 2.)  He argues that he needs this testimony to prove his claim that the Indictment filed against him was fraudulent.  (Id.)  Portions of this testimony were already disclosed to Martinez.  In advance of trial and in accordance with its obligations

23

under 18 U.S.C. § 3500, the Government provided Martinez "with the Grand Jury testimony of the two witnesses who testified before the Grand Jury in this case." (Gov't Mem. at 4 n.1.) In his reply papers, Martinez failed to respond to this contention. (See Pet'r Reply.) To the extent that Martinez seeks the grand jury testimony of other witnesses who did not testify against him at trial, he has not shown grounds entitling him to such discovery. As discussed supra, Martinez's claim that the Indictment is fraudulent fails as a matter of law. (See supra, Section IV.B.) Therefore, Martinez's motion for discovery is denied as moot.

## V. CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (No. 10 Cv. 7561(RPP), ECF No. 1), and motion for discovery pursuant to Fed. R. Crim P. 6 (No. 10 Cv. 7561(RPP), ECF No. 3) are denied. No hearing is necessary, as "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; Armienti v. United States, 234 F.3d 820, 822-23 (2d Cir. 2000).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). As the Petitioner makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253.

IT IS SO ORDERED.


Dated: New York, New York
       March 3ᶜ, 2012



Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion & Order were sent to:**

*Petitioner*:
Victor Martinez, pro se (by mail)
59158-054
F.C.I. Otisville
P.O. Box 1000
Otisville, NY 10963

*The Government*:
AUSA John Zach (by email)
United States Attorney SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-2410
Fax: (212)-637-2527
Email: john.zach@usdoj.gov